IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 25, 2006 Session

## STATE OF TENNESSEE v. JIMMY DALE PICKETT

**Direct Appeal from the Circuit Court for Franklin County**
**No. 15548   Thomas W. Graham, Judge**

---

**No. M2005-02434-CCA-R3-CD - Filed February 14, 2007**

---

A Franklin County Circuit Court jury convicted the appellant, Jimmy Dale Pickett, of first degree premeditated murder and especially aggravated robbery, and the trial court sentenced him to concurrent sentences of life and twenty years, respectively.  On appeal, the appellant claims (1) that he is entitled to a retrial because the State violated the rule of sequestration; (2) that the trial court erred by denying his motions to suppress his confessions; (3) that the trial court erred by allowing the jury to use a transcript, which had not been introduced into evidence, during deliberations; (4) that the trial court erred by refusing to give the jury a corpus delicti instruction; and (5) that the State committed prosecutorial misconduct during closing arguments.  Finding no errors requiring reversal, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Philip A. Condra and Quisha Light, Jasper, Tennessee, for the appellant, Jimmy Dale Pickett.

Paul G. Summers, Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The appellant does not contest the sufficiency of the evidence.  Taken in the light most favorable to the State, the evidence at trial revealed that on Tuesday, October 14, 2003, Beverly Searles telephoned the Franklin County Sheriff's Department and reported that her brother, John Harlan Moore, had not reported to work that day and was missing.  The next evening, Officer Dustin

Foster went to the Pickett farmhouse on Old Salem-Lexie Road and spoke with the appellant. He asked the appellant about Moore, and the appellant gave Officer Foster directions to Moore's trailer. The appellant seemed nervous, and Officer Foster noticed a small yellow Toyota pickup truck parked at the farmhouse.

Officer Foster and another officer drove to Moore's trailer. When they got out of the car, they immediately smelled a decaying body. Officer Foster telephoned Investigator Mike Bell, who told the officers to go into the trailer. The officers pried open the door, went into the trailer's rear bedroom, and found Moore dead in his bed. They immediately left the trailer, secured the scene, and telephoned Investigator Bell.

When Investigator Bell arrived at the scene, he put on a respirator and went into the victim's bedroom. Blood splatter was on the bedroom walls, but a clean sheet covered the victim. Investigator Bell requested help from the Tennessee Bureau of Investigation (TBI) and spoke with Jean Grant, the victim's neighbor. Grant told Investigator Bell that she last saw the victim alive on the Saturday or Sunday morning before officers found his body and that she saw the victim come out of his trailer and walk past her house. The appellant drove by, blew the horn, and the victim got into the appellant's car. The two men then drove back to the victim's trailer. Grant often saw the appellant coming and going from the trailer but did not know if he lived there with the victim. After speaking with Grant and some of the victim's other neighbors, Investigator Bell decided that he needed to speak with the appellant. At 3:00 a.m. on October 16, Investigator Bell and several officers left the victim's trailer and went to the Pickett farmhouse. When they arrived, Investigator Bell knocked on the front door, but no one answered. The officers went to the back door and noticed that it was standing open. The appellant was gone, but a cooler containing ice and beer was in the back of the yellow pickup truck. Officers immediately began searching for the appellant, and surrounding counties sent manpower to help with the search.

On the evening of October 16, a group of officers approached an abandoned tractor trailer rig and found the appellant hiding in the rig's sleeper berth. They arrested him, and Tullahoma Police Department Detective Earl Morse informed the appellant of his rights. Franklin County Sheriff's Department Lieutenant Danny Warren put the appellant into his police vehicle and asked the appellant if he wanted to tell him what had happened to the victim. The appellant said yes and told Lieutenant Warren the following: The victim had been stealing money from the appellant. On Friday, October 10, 2003, the victim stole twenty dollars out of the appellant's wallet. About 7:00 a.m. the next morning, the appellant stood in the doorway of the victim's bedroom and shot the victim with a sixteen-gauge shotgun while the victim was sleeping in bed. After the shooting, the appellant covered the victim with a sheet and took the victim's wallet out of a pair of pants that were on the bed. The appellant took one hundred six dollars out of the wallet, drove to the Speedway Market, and bought beer. The appellant said that he had been planning to kill the victim for at least two weeks.

Lieutenant Warren drove the appellant to Bean's Creek, where the appellant showed him the shotgun he had used to kill the victim and three live shotgun shells. The appellant also told

Lieutenant Warren that he had thrown the victim's wallet into a creek in Moore County and that he had consumed antifreeze. Lieutenant Warren drove the appellant to the emergency room at the Southern Tennessee Medical Center (SMTC). The next day, Lieutenant Warren drove to Moore County and found the victim's wallet. The wallet contained the title to a 1981 Toyota pickup in the name of Jeremy Pickett.

Faye Jernigan, a nurse in the emergency room, testified that the appellant did not appear to be intoxicated on the night of October 16. The appellant told her that he drank at least one-half can of antifreeze because he had shot a man with a sixteen-gauge shotgun. The appellant was treated for ingesting antifreeze and was transferred to Vanderbilt Hospital. Franklin County Sheriff's Department Deputy Ricky Summers testified that he sat with the appellant while the appellant was being treated at the SMTC and that the appellant said, "All this treatment for just killing somebody." Two other officers, who were assigned to guard the appellant at the SMTC and Vanderbilt, also testified that the appellant said he killed a man.

After being treated at Vanderbilt, the appellant was transferred to Harton Hospital in Tullahoma. On October 20, TBI Special Agent Kendall Barham visited the appellant in his hospital room, advised the appellant of his Miranda rights, and interviewed him. He took notes during the interview, went to his office and typed out the appellant's statement, and returned to the hospital. The appellant read and signed the statement. According to the statement, the appellant was living with the victim, and the victim was stealing money from him. The appellant got "fed up [and] pissed off" about the victim's stealing and decided that he "would be doing Harlan a favor by killing him." On Saturday, October 11, 2003, the appellant woke up early, saw the victim in the appellant's bedroom, and saw the victim going through the appellant's billfold. The appellant did not say anything to the victim and went back to sleep. He woke up again about 5:30 a.m. and walked to the doorway of the victim's bedroom. The victim was asleep, lying on his back, and was facing toward a window but away from the appellant. The appellant shot the victim, picked up the empty shotgun shell, and covered the victim with a sheet that had been laying on the floor. The appellant carried the victim's pants to the living room and took money out of the victim's wallet. He left the house and drove away in the victim's yellow pickup truck. Agent Barham testified that the police found a pair of pants in the victim's living room and that the appellant appeared truthful.

Forensic Pathologist Charles Harlan performed the victim's autopsy on October 17, 2003, and testified that the victim died of a shotgun wound to the forehead. The victim's body was significantly decayed, and Dr. Harlan stated that the victim had been dead "about a week, give or take a few days." He stated that fluids collected from the victim were not suitable for toxicology tests due to the body's condition. TBI Special Agent Forensic Scientist Shelly Betts examined a plastic shot sleeve, wadding, and nineteen lead pellets recovered from the victim and concluded that they were consistent with a sixteen-gauge shotgun shell. TBI Special Agent Forensic Scientist Robert E. McFadden testified that he found the appellant's fingerprint on a glass jar in the victim's kitchen. He also found the appellant's fingerprint on a beer can and a cigarette pack in the victim's living room.

-3-

The appellant's ex-wife testified for the appellant that he was meek, did not have a bad temper, and was not violent. Her current husband testified that he had known the appellant for ten years and had never seen the appellant angry or violent. The jury convicted the appellant of first degree premeditated murder and especially aggravated robbery.

## II. Analysis

### A. Violation of the Rule of Sequestration

First, the appellant claims that he is entitled to a new trial because some of the State's witnesses "blatantly, unashamedly, and haughtily" violated Tennessee Rule of Evidence 615, the rule of sequestration. The State contends that the appellant has waived this issue because he failed to object at trial and that his "bald accusations" are not supported by the record. We agree with the State that the appellant has waived this issue.

Investigator Bell testified for the State on the second day of trial. On cross-examination, defense counsel asked Bell if he remembered meeting with some people, including the prosecutors and Agent Barham, after trial adjourned the previous day. Investigator Bell answered, "Possibly," and counsel then asked him, "Were discussions held at that moment about how the testimony had developed during the day?" Investigator Bell again answered, "Possibly" and said, "I don't remember." He then acknowledged the meeting occurred but said he did not remember exactly what was said during the meeting. Agents Betts and McFadden testified for the State on the third day of trial. On cross-examination, Agent Betts testified that the previous day, she heard Agent Barham ask Agent McFadden about whether the window in the victim's bedroom had been open or closed during the TBI's investigation. Agent McFadden acknowledged on cross-examination that the previous day, Agent Barham brought "the question of the half opened window" to his attention. He said that Agent Barham had not yet testified when Barham talked with him about the window.

Tennessee Rule of Evidence 615 is the rule of sequestration and is "now colloquially referred to as 'The Rule.'" Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (5th ed. 2005). Rule 615 provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Tenn. R. Evid. 615. The purpose of the Rule is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The Rule may be invoked at any time and is mandatory upon its invocation. See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). There is no prescribed sanction for a violation of the Rule; rather, a trial court retains discretion to impose the appropriate sanction. See State v. Black, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001). Further, "[t]he decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party." Id. at 424-25.

The appellant claims that Investigator Bell discussed the evidence with the prosecutors after the first day of trial and then "carried the information" to Agents Betts and McFadden. He contends that his accusations are "abundantly supported by the testimony of the violators." In a separate, but related issue, the appellant also claims that he was denied due process by "[c]areless utterances, made in the presence of a sequestered witness who then pursued it with two other State's witnesses"; that the State's failure to disclose the after-hours meeting violates Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and that Agents Barham, Betts, and McFadden "could have been prohibited from testifying as a sanction for this improper contact."

Our review of the record reflects that before the first State witness testified, the Rule was invoked. The defense briefly questioned Investigator Bell during cross-examination about whether a meeting occurred after the first day of trial and whether the participants discussed the evidence. The defense also briefly questioned Agents Betts and McFadden about whether they had discussed evidence. However, the appellant never alleged at trial that the witnesses violated the Rule, never objected to any of the witnesses' testimony, and never requested a jury-out hearing to determine the facts of the violation or prejudice to the appellant. Therefore, we hold that he has waived these issues. See Tenn. R. App. P. 36(a) (providing that our rules do not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Moreover, given the overwhelming evidence of the appellant's guilt, we discern no plain error. See Tenn. R. Crim. P. 52(b).

## B. Motions to Suppress

Prior to trial, the appellant filed three motions to suppress his statements to police. The trial court heard the first motion during one suppression hearing and heard the remaining two motions during a second suppression hearing. The appellant claims that the trial court erred by failing to grant his motions to suppress his statements and any evidence obtained as a result of his statements. He contends that the trial court "chose to rearrange . . . facts learned long after the [appellant's] arrest" and "injected its own facts" during the suppression hearings. The State argues that the trial court properly denied the appellant's motions. We agree with the State.

### 1. Involuntary Confession

In the appellant's first motion to suppress, he argued that the trial court should suppress his statements to police because he (1) did not knowingly, intelligently, and voluntarily waive his Miranda rights; (2) was secretly audiotaped in violation of his right against self-incrimination; and (3) was questioned by police after an attorney had been appointed to represent him. At the motion hearing, Detective Morse testified for the State that on October 16, 2003, his superior officer asked him to take the SWAT team to the Lexie Crossroads area of Franklin County to help look for a man involved in a shooting. Detective Morse and some of his colleagues with the special operations force went to the location. About fifteen or twenty minutes after they arrived and started searching, they approached an old, abandoned tractor trailer rig. A wasp nest was in the passenger door, so another officer opened the driver's side door, looked into the rig's sleeper berth, and found the appellant.

Detective Morse estimated that the temperature in the rig was about one hundred ten degrees and said, "There was no reason anybody could conceivably be living in that tractor-trailer."

The appellant calmly exited the rig, officers placed him on the ground and handcuffed him, and Detective Morse recited Miranda warnings. Although the appellant was lying on the ground on his stomach, he turned his head and looked up at Detective Morse while Morse was reciting the appellant's rights. Detective Morse stated that he asked the appellant twice if he understood the warnings, and the appellant said yes twice. The appellant later led officers to Bean Creek, where they found a sixteen-gauge shotgun and some shotgun shells. Detective Morse stated that the appellant sounded "normal," never seemed confused, never offered any resistance, and gave specific directions to the gun and shells. On cross-examination, Detective Morse stated that he did not notice if the appellant was unsteady on his feet, and he acknowledged that he did not ask the appellant if the appellant wanted to waive his rights.

Lieutenant Warren testified that he learned officers had found the appellant and that he drove to the appellant's location. When he arrived, the appellant was lying on the ground with his hands cuffed behind his back, and Detective Morse was finishing Miranda warnings. Officers stood the appellant up, and Lieutenant Warren walked the appellant to his police vehicle. He put his arm around the appellant and asked if the appellant wanted to tell him what had happened to the victim. The appellant said yes and told him about the shooting. Lieutenant Warren put the appellant into his vehicle and put a transmitter device on the dashboard to record what was being said in the vehicle. Although the transmitter was on the dashboard, Lieutenant Warren did not tell the appellant about it. The appellant then led officers to Bean's Creek. Lieutenant Warren said that the appellant gave specific details about the crimes and did not act like he had consumed alcohol or drugs.

On cross-examination, Lieutenant Warren testified that Detective Morse asked the appellant if he understood his rights and the appellant said yes. Lieutenant Warren never repeated the Miranda warnings for the appellant. He acknowledged that the appellant's statements captured by the transmitter were recorded and that a written transcript of the recording shows parts of the appellant's conversation with Lieutenant Warren were inaudible.

Agent Barham testified that on October 17, 2003, he attended the victim's autopsy in Nashville and visited the appellant at Vanderbilt Hospital. Agent Barham advised the appellant of his rights and told the appellant that he needed to speak with him about the victim's death. The appellant was hooked up to a dialysis machine and seemed lethargic, so Agent Barham decided not to interview him at that time. On October 20, Agent Barham visited the appellant at Harton Regional Medical Center in Tullahoma. He read Miranda warnings to the appellant, and the appellant said that he remembered them from his arrest. The appellant agreed to talk, and Agent Barham took notes during the interview. He left the hospital and typed out the appellant's statement. That afternoon, he obtained the appellant's eyeglasses and returned to the hospital. He read the appellant's statement to him, and the appellant read it. The appellant seemed alert, made no changes to the statement, and signed it. On cross-examination, Agent Barham acknowledged that he did not

ask the appellant if he wanted to waive his rights and that a guard was present while he spoke with the appellant at Vanderbilt and Harton hospitals.

The State recalled Lieutenant Warren to testify. He said that on October 28, 2003, he was at the sheriff's department, and the appellant was in the jail. A corrections officer approached Lieutenant Warren and told him that a man in the lobby wanted to speak with him. Lieutenant Warren went to the lobby and spoke with the appellant's brother, who said that the appellant had asked for Lieutenant Warren and needed to tell the lieutenant something. Lieutenant Warren told the appellant's brother that he could not speak with the appellant because the appellant had an attorney and returned to his office. A short time later, a corrections officer telephoned Lieutenant Warren and told him that the appellant wanted to speak with him. Lieutenant Warren had officers bring the appellant to his office and went over a waiver of rights form with the appellant. The appellant signed the form and said that he still wanted to speak with Lieutenant Warren without an attorney present. The appellant said he did not kill the victim but acknowledged he hid from police and disposed of the shotgun and shells. Lieutenant Warren tape recorded his conversation with the appellant and said the appellant responded to his questions and did not seem confused. On cross-examination, Lieutenant Warren said he initially refused to speak with the appellant because he "wanted the [appellant's] request to go though an official person, instead of a family member."

The trial court denied the appellant's motion to suppress his statements. Regarding the appellant's October 16 confession to Lieutenant Warren, the trial court ruled that the appellant received Miranda warnings and voluntarily waived his rights. Regarding the appellant's October 20 statement to Agent Barham, the trial court found nothing improper. Finally, regarding the appellant's October 28 statement to Lieutenant Warren, the trial court concluded that the appellant had not been coerced or forced into giving the statement and that the appellant had a right to speak with Lieutenant Warren without his attorney present.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use

of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers advise a defendant of his or her right to remain silent and of his or her right to counsel before they initiate custodial interrogation. State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005). If these warnings are not given, statements elicited from the individual may not be admitted in the prosecution's case-in-chief. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). A waiver of constitutional rights must be made "voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

Regarding the appellant's statements to Lieutenant Warren on October 16 and Agent Barham on October 20, Detective Morse testified that he gave the appellant Miranda warnings when officers arrested the appellant on October 16, and Agent Barham testified that he re-Mirandized the appellant on October 20 before the appellant's interview. The witnesses testified that the appellant agreed to speak with them and that he was alert and did not appear to be under the influence of anything. The trial court obviously accredited the witnesses' testimony, concluding that the appellant received Miranda warnings and voluntarily waived his rights. We can find no proof to refute the trial court's findings. As to the appellant's October 28 statement to Lieutenant Warren, the evidence shows that the appellant sent word through his brother and a corrections officer that he wanted to speak with Lieutenant Warren. Warren had officers bring the appellant to his office and gave the appellant Miranda warnings, and the appellant stated that he wanted to speak without his attorney present. Because the appellant initiated the contact with Lieutenant Warren, his right to counsel was not violated. See Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981). The trial court properly denied the appellant's first motion to suppress.

## 2. Warrantless Arrest

In the appellant's remaining two motions to suppress, he argued that the trial court should suppress all evidence obtained as a result of his warrantless arrest because the police had no probable cause to arrest him. At the suppression hearing, Officer Foster testified that the victim's sister reported him missing on October 14, 2003. The next day, Officer Foster spoke with her, and she told him that the victim and the appellant "had been hanging out together." As a result of his conversation with her, Officer Foster went to the Pickett farmhouse and noticed a yellow pickup truck parked there. Officer Foster knocked on the door and spoke with the appellant, who was very nervous. The appellant told Officer Foster that he last saw the victim on Saturday, October 11 between 8:00 and 9:00 a.m. and that the victim left with a blonde female and may have been headed toward Fayetteville. The appellant never mentioned that he had been living with the victim but gave Officer Foster directions to the victim's trailer. Officer Foster went there and discovered the victim's body. On cross-examination, Officer Foster stated that when he first arrived at the Pickett farmhouse, the yellow pickup truck had no significance.

Investigator Bell testified that on October 15, 2003, Officer Foster telephoned him from outside the victim's trailer, said he was working on a missing person case, and said he smelled what

he thought was a dead body. Investigator Bell told Officer Foster to enter the trailer, and Officer Foster telephoned him again later and reported finding the victim. Investigator Bell went to the scene, went into the victim's bedroom, looked under a sheet, and saw the victim's decaying body. Investigator Bell noticed a lot of blood in the room but noticed that a clean white sheet covered the victim. He immediately suspected foul play. The victim's neighbors began arriving at the trailer to find out what was going on. Jean Grant and other neighbors told Investigator Bell that the appellant had been living in the trailer with the victim. Investigator Bell also learned from neighbors that Jeremy Pickett, a relative of the appellant, had traded his small yellow pickup truck for the appellant's bass boat and that the pickup was usually parked at the victim's trailer. Investigator Bell spoke with Officer Foster, and Officer Foster told him about speaking with the appellant earlier. Investigator Bell decided that he needed to speak with the appellant and went to the farmhouse about 3:00 a.m. He noticed a small yellow pickup parked there. The back door of the home was open, and the appellant was gone. However, a cooler containing ice and beer was in the pickup. Investigator Bell later located Jeremy Pickett, and he told Investigator Bell that he had traded his truck for the victim's, not the appellant's, boat.

On cross-examination, Investigator Bell stated that he did not find anything with the appellant's name on it in the trailer and that he did not see anything in the trailer to connect the appellant to it. He stated that he knew of no argument between the victim and the appellant at the time of the appellant's arrest, that he went to the Pickett farmhouse wanting only to speak with the appellant, and that he did not get a search warrant for the farmhouse. However, he said the appellant was a "possible suspect because he lived there [with the victim]."

The trial court ruled that many facts linked the appellant to the victim's death, including the appellant's living with the victim and his being nervous when Officer Foster spoke with him. The trial court also concluded that the appellant was "hiding out" in the tractor trailer rig when officers discovered him and that this was "a very important factor" and "[a]n indication of guilt." The trial court ruled that the officers had a reasonable basis for the appellant's warrantless arrest and denied his two motions.

Tennessee Code Annotated section 40-7-103(a)(3) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed [it]." In the instant case, upon the discovery of the victim and the circumstances surrounding the discovery of his body, it was probable that a homicide had been committed. Homicide, in its varying forms, is a felony. See Tenn. Code Ann. § 39-13-201. Thus, our next inquiry is whether police reasonably believed the appellant committed the offense. See State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). Our supreme court has explained that "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act," constitutes probable cause. State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. See State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim.

App. 1990). To this end, Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based on evidence, which may be hearsay in whole or in part provided there is a substantial basis to believe . . . the source of the hearsay is credible . . . and . . . there is a factual basis for the information furnished." It has long been established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

In this case, Officer Foster spoke with the victim's sister, and she told him that the appellant and the victim had been "hanging out together" and that the victim was missing. After speaking with her, Officer Foster went to the Pickett farmhouse and spoke with the appellant. Officer Foster noticed that the appellant was nervous, and the appellant admitted seeing the victim on October 11, three days before the victim failed to report to work. After Officer Foster discovered the victim's decaying body, Investigator Bell went to the scene, and Officer Foster told Investigator Bell about his conversation with the appellant. Neighbors also told Investigator Bell that the appellant had been living with the victim, and neighbor Jean Grant reported that she last saw the victim alive on the morning of October 11 or 12, several days before officers discovered the victim. She also said the victim was with the appellant. Investigator Bell went to the Pickett farmhouse to speak with the appellant and noticed a yellow pickup, which neighbors had reported seeing frequently at the victim's trailer. Investigator Bell discovered that the appellant had left the home with the back door standing open and a cooler full of ice and beer in the pickup, indicating a hasty retreat and resulting in a legitimate inference that the appellant was involved in the victim's death. Then, after searching for the appellant, officers found him hiding in the tractor trailer's sleeper berth, which Detective Morse estimated had a temperature of one hundred ten degrees. In light of all of the circumstances, we conclude that the officers had probable cause to arrest the appellant.

We note that the appellant argues that the trial court "created its own conclusions and accepted without critical analysis or fair assessment contradictory and perjurious responses from police officers and investigators." However, the trial court, as the trier of fact, was in the best position to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. Odom, 928 S.W.2d at 23. The trial court obviously accredited the officers' testimony and resolved all conflicts in the evidence in favor of the State. The appellant thoroughly cross-examined the State's witnesses at the suppression hearings and never claimed at the hearings that the witnesses were committing perjury. The trial court properly denied the appellant's motions to suppress.

C. Jury's Use of Extraneous Information

Next, the appellant claims the trial court erred by allowing the jury to use a transcript of the appellant's audiotaped confession during deliberations because the transcript had not been introduced into evidence. The State contends that the jurors were only allowed to examine the transcript for determining what portion of the audiotape they wanted to hear and that the trial court

admonished the jury at least three times that it could not consider the transcript in determining the appellant's guilt. We conclude that the appellant is not entitled to relief.

During Lieutenant Warren's testimony, the State introduced into evidence an audiotape of his October 16 conversation with the appellant made while they were sitting in Lieutenant Warren's police vehicle. The State also asked Lieutenant Warren about a transcript of the audiotape and passed out copies of the transcript to each juror. The trial court instructed the jury that the purpose of the transcript was to help the jurors follow what they heard on the tape but that the tape "controls over any decisions you make about this testimony." The State marked the transcript for identification purposes only and never made it an exhibit. After the jury listened to the tape and was excused from the courtroom, the trial court stated,

> I don't know what on earth you plan on doing or trying to do with that tape, but I sure don't want us to have to put the jury through much more with regard to that. Just a suggestion in the future, if we ever [have] something like that where there are big gaps of time, just dead time, we need to get together before trial and cut that out.

During jury deliberations, the jury returned to the courtroom and informed the trial court that it wanted to listen to the auidotape again. The trial court stated,

> I don't want you to talk to me about how you're leaning or anything about why you want to listen to the tape, but is there a particular part of the tape that we can cue up? You know, this thing just runs from beginning to end. They have not indexed it into parts. If there's a location in the transcript that you can identify for us, we could possibly speed the process up by trying to get to it for you so you can listen to it. Is there any particular part or do you want to listen to the whole thing?

A juror responded that if the jury could look at the transcript, it could find the part of the tape it wanted to hear. The trial court passed out transcripts to each juror, and one of the jurors stated, "That's all we need really. We don't really need to listen." The trial court told the jury that the transcript "is not the exact thing," that the jury "really ought to listen to the tape," that the transcript was helpful to find a location on the tape, and that the jury could take the transcripts back to the jury room for that purpose. The defense objected, but the trial court stated, "I'm going to let them do that. . . . Otherwise, it's two hours or more of just sitting there." The trial court noted that the jury had already read the transcript once and that nothing in the transcript was particularly misleading. The record reflects that the jury returned to the jury room and picked out four or five transcript pages it wanted to hear on the audiotape. The corresponding portion of the tape was played for the jury, and the jury continued deliberations.

Tennessee Rule of Criminal Procedure 30.1 (2005) states as follows:

> Upon retiring to consider its verdict the jury shall take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, unless the court, for good cause, determines that an exhibit should not be taken to the jury room.

Because the transcript was introduced for identification purposes only and was not introduced into evidence, the best practice would have been for the trial court not to allow the jury to take the transcript copies into the jury room. However, the trial court instructed the jury during Lieutenant Warren's testimony that the transcript was only an aid and that the tape, not the transcript, was the evidence. When the trial court allowed the jury to take the transcript copies into the jury room, it stated that the jury could use the transcript for the purpose of finding the portion of the tape that the jury wanted to hear. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). In any event, the appellant does not claim there is a material difference in the audiotape and the transcript. Also, during Lieutenant Warren's testimony, the jury was allowed to read the transcript while it listened to the tape. Therefore, the jury had already seen the transcript once before, and we conclude that any error was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### D. Corpus Delicti Instruction

The appellant claims that the trial court erred by refusing to instruct the jury that the corpus delicti of the crimes could not be proven by the appellant's confessions alone. The State contends that the trial court properly denied the appellant's request for the special corpus delicti instruction and that the appellant's confessions were amply corroborated. We agree with the State.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). However, trial courts need not give requested instructions if the substance of the instructions is covered in the general charge. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995).

"Corpus delicti" literally means the body of the crime. State v. Shepherd, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). In order to establish the corpus delicti of a crime, the State must establish beyond a reasonable doubt (1) that a certain result has been produced and (2) that some person is criminally responsible for the act. State v. Jones, 15 S.W.3d 880, 890-91 (Tenn. Crim. App. 1999). State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000) (citing Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911)). Some corroborating evidence is required which, independently of the confession, tends to establish the corpus delicti of the offense charged. Id. However, where there is a confession, the corroborative evidence "need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession." Ricketts v. State, 241 S.W.2d 604, 606 (Tenn. 1951). The corroborating evidence is sufficient to sustain a conviction if "it tends to connect

the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." Id.; see also Smith, 24 S.W.3d at 281. "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." Taylor v. State, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

We have reviewed the jury instructions, and initially note that the trial court properly instructed the jury on the charged offenses and all lesser included offenses. Regarding the appellant's confession, the trial court instructed the jury as follows:

> Now, ladies and gentlemen, also evidence of a confession has been introduced in this trial. A confession is a statement by the defendant that he engaged in conduct which constitutes the crime charged and is an acknowledgment of guilt itself.
>
> The Court has ruled that the confession is admissible in evidence, but it is your duty to judge it's truth. In doing so you should consider the circumstances under which the confession was obtained as well as any evidence which contradicts all or part of the statements made. You must consider all the statements made by the defendant, whether favorable or unfavorable to him, and you must not disregard any of them without good reason. If the evidence in the case leads you to believe that the confession or any part of it is untrue or was never made, you should disregard it, or that portion which you do not believe.
>
> You are the sole judge of the weight - - what weight should be given to those portions of the confession which you believe and you should consider them along with all other evidence in the case in determining the defendant's guilt or innocence.

The trial court's instructions regarding the appellant's confessions closely followed Tennessee Pattern Jury Instructions--Criminal 42.12, the instruction for a confession. The instructions clearly advised the jurors that it was their duty to determine the truth of the confessions and the circumstances surrounding them and that the jury should disregard all or any part of the confessions that it believed were untrue. In addition, the jury was advised that it was the sole judge of what weight should be given to the confessions and that all other evidence in the case should be considered along with the confessions in determining guilt or innocence. We are unable to conclude that the trial court should have given the requested corpus delicti instruction.

In any event, the appellant's confessions were sufficiently corroborated in this case. The appellant told officers that on Saturday, October 11, he stood in the doorway of the victim's bedroom and shot the sleeping victim with a sixteen-gauge shotgun. The appellant covered the victim with a sheet that had been on the floor, picked up the spent shotgun shell, and carried the victim's pants to the living room. There, he took money out of the victim's wallet. He left the shotgun in the Bean's Creek area and abandoned the victim's wallet in a creek in Moore County. Officers found

the victim's decomposing body in bed and covered with a clean sheet, and a pair of pants were in the living room. Officers did not find a spent shotgun shell in the bedroom. They went to the Bean's Creek area and located the shotgun and some unused shells, and Lieutenant Warren found the victim's wallet in Moore County. Dr. Charles Harlan performed the victim's autopsy on October 17 and stated that the victim had been shot in the forehead and had been dead about a week, "give or take a few days," which would have put his time of death around October 11. The evidence at trial sufficiently corroborated the appellant's confessions, and he is not entitled to relief.

### E. Prosecutorial Misconduct

Finally, the appellant claims that the prosecutor committed prosecutorial misconduct during closing arguments by expressing a personal opinion about the appellant's guilt and by making an improper comment. The appellant acknowledges that while the prosecutor's comment, "standing alone, probably did not rise to the level of a denial of due process," the comment, along with the other errors that occurred in this case, denied the appellant his right to a fair trial. The State contends that the prosecutor's comments were not improper. We conclude that the appellant is not entitled to relief.

During the State's closing argument, the prosecutor told the jury that the appellant had premeditated killing the victim and had taken the victim's wallet, money, and truck. The prosecutor then stated, "Ladies and gentlemen, this man is guilty of what he's charged with," and the defense objected. The following exchange occurred:

> THE COURT: All right, it's argument. I'll let you -- you haven't stepped across the line yet. Go ahead.
>
> [THE STATE]: Tactics, lawyers' tactics, object in the middle of a person's argument and throw them off.
>
> [DEFENSE COUNSEL]: Your Honor, I object to that. That was –
>
> THE COURT: [General], that's uncalled for.

The State's closing argument resumed.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) the relative strength or weakness of the case.

Id. at 368 (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

We find nothing inappropriate about the prosecutor's stating that the appellant was guilty. Granted, a prosecutor should not express his or her personal opinion about a defendant's guilt. Goltz, 111 S.W.3d at 6. However, in our view, the prosecutor was simply reviewing the evidence against the appellant and stating the State's position in the case, i.e., that the appellant was guilty of the crimes charged. Therefore, defense counsel's objection was improper. The prosecutor's comment about defense counsel's tactics, however, was also improper. See State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 938, at *34 (Nashville, Oct. 21, 2004) (stating that "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial"). Nevertheless, given the strength of the State's case, we conclude that the State's comment was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE